BRIDGET HILL
Wyoming Attorney General
D. DAVID DEWALD
Deputy Attorney General
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov
*Attorney for Plaintiff State of Wyoming*

TYLER R. GREEN*
Special Assistant Attorney General
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Attorney for Plaintiff State of Wyoming*

*Application for admission pro hac vice forthcoming*

AUSTIN KNUDSEN
Attorney General of Montana
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.*
Deputy Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov
*Attorneys for Plaintiff State of Montana*

KATHLEEN S. LANE*
Special Assistant Attorney General
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
katie@consovoymccarthy.com
*Attorney for Plaintiff State of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

STATE OF WYOMING, and
STATE OF MONTANA,

*Plaintiffs*,

v.

DEB HAALAND, in her official capacity as
the Secretary of the U.S. Department of the In-
terior; U.S. DEPARTMENT OF THE INTE-
RIOR; TRACY STONE-MANNING, in her
official capacity as the Director of the Bureau
of Land Management; BUREAU OF LAND
MANAGEMENT; and ANDREW AR-
CHULETA, in his official capacity as the Wyo-
ming State Director for the Bureau of Land
Management; SONYA GERMANN, in her of-
ficial capacity as the Montana/Dakotas State
Director for the Bureau of Land Management,

*Defendants*.

Case No. _____

## PETITION FOR REVIEW

Coal is still king in the Powder River Basin. The Powder River Basin spans across northeastern Wyoming and southeastern Montana and accounts for 85% of all coal produced on federal land. Because this coal is found on federal land within Wyoming's and Montana's borders, these States historically have worked alongside the federal government to manage the land. This cooperation is no accident. Congress understood the important role that states like Wyoming and Montana play in managing federal land, particularly when those lands contain valuable mineral resources like coal. To memorialize the coordination needed to manage these lands, Congress passed the Federal Land Policy and Management Act (FLPMA), the National Environmental Policy Act (NEPA), and the Mineral Leasing Act (MLA). Each of these statutes provides clear requirements for the Department of Interior and the Bureau of Land Management (BLM) to follow when working alongside states to manage federal lands within their borders.

The 2024 Records of Decision and Approved Resource Management Plan Amendments for the Buffalo Field Office (Buffalo ARMPA) and Miles City Field Office (Miles City ARMPA) turn these statutes on their head and end new federal coal leasing in the Powder River Basin. It marks a total shift in BLM's treatment of coal leasing. It marks a new era for how BLM will engage with states, counties, and local governments moving forward. And it marks a devastating blow to the States of Wyoming and Montana, where coal production fuels the economy. Even though these States, their agencies and counties, industry groups, and members of Congress objected to the proposed management plan, BLM gave their concerns short shrift and moved forward with its own agenda.

The federal government's abrupt halt of new leasing in the Powder River Basin is unreasonable, unjustified, and unsupported by federal law. This Court should set aside the Buffalo and Miles City ARMPAs.

## JURISDICTION AND GROUNDS FOR RELIEF

1.       This Court has jurisdiction under 28 U.S.C. §1331 because the claims presented in this Petition arise under federal law and 5 U.S.C. §§702 and 706, which waive sovereign immunity. An actual controversy exists between the parties within the meaning of 28 U.S.C. §2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§2201-02, 5 U.S.C. §§705-06, and its inherent equitable powers. The claims presented arise under FLPMA, NEPA, MLA, and the APA.

2.       Venue is proper in this Court under 28 U.S.C. §1391(e) because Petitioner, the State of Wyoming, resides within the District of Wyoming and because all the land subject to the Buffalo ARMPA is situated in the District of Wyoming.

3.       The State of Wyoming challenges the Secretary's decision to adopt the No Leasing Alternative in the Buffalo ARMPA.

4.       The Buffalo ARMPA is a reviewable final agency action.

5.       The State of Montana challenges the Secretary's decision to adopt the No Leasing Alternative in the Miles City ARMPA.

6.       The Miles City ARMPA is a reviewable final agency action.

## PARTIES

7.       Petitioner State of Wyoming is a sovereign state that regulates land use and oil and gas development within its borders through duly enacted state laws. The State of Wyoming exercises trust responsibilities over its State lands, including managing those lands for designated beneficiaries. Federal law gives the State of Wyoming a substantial portion of the revenue that the Secretary collects from federal oil, gas, and coal leasing on federal lands. Bridget Hill is the Attorney General of Wyoming. She is authorized to sue on Wyoming's behalf. *See* Wyo. Stat. Ann. § 9-1-603.

8.      Petitioner State of Montana is a sovereign state that regulates land use and oil and gas development within its borders through duly enacted state laws. The State of Montana exercises trust responsibilities over its State lands, including managing those lands for designated beneficiaries. Federal law gives the State of Montana a substantial portion of the revenue that the Secretary collects from federal oil and gas leasing on federal lands. Austin Knudsen is the Attorney General of Montana. He is authorized to sue on Montana's behalf. *See* Mont. Code Ann. §2-15-501.

9.      Defendant Debra Haaland is the Secretary of Interior. Secretary Haaland implements oil, gas, and coal development on federal lands in accordance with federal law and is responsible for the decisions challenged in this petition. Secretary Haaland is sued in her official capacity.

10.     Defendant United States Department of the Interior is a federal executive department. Department officials help the Secretary develop, implement, and enforce the Secretary's policies and decisions, including the decisions challenged in this petition.

11.     Defendant Tracy Stone-Manning is the Director of the Bureau of Land Management. Director Stone-Manning is sued in her official capacity.

12.     Defendant Bureau of Land Management is an agency within the United States Department of the Interior. It manages approximately 245 million acres of federal public lands in the United States. BLM is the agency responsible for promulgating the challenged Buffalo ROD and ARMPA and the Miles City ROD and ARMPA.

13.     Defendant Andrew Archuleta is the Wyoming State Director for BLM. Director Archuleta is responsible for overseeing management of BLM lands in Wyoming. Director Archuleta is sued in his official capacity.

14.     Defendant Sonya Germann is the Montana/Dakotas State Director for BLM. Director Germann is responsible for overseeing management of BLM lands in Montana. Director Germann is sued in her official capacity.

## STATUTORY BACKGROUND

15.    The management of public lands is guided by several federal statutes, including FLPMA, NEPA, and the MLA. FLPMA authorizes BLM to develop formal resource management plans and prescribes what BLM must consider when developing those plans. Because those plans constitute major federal actions affecting public lands, NEPA further instructs BLM on specific factors it must consider when developing those plans. And because the specific plans in this case involve coal leasing, the MLA provides even more guardrails within which the agency must develop those plans.

16.    The upshot of those statutes: After some initial public engagement, the agency first creates a Draft Supplemental Environmental Impact Statement (SEIS) and a Potential Resource Management Plan (RMP) based on that Draft SEIS. After further review and public engagement, the agency creates a Final SEIS and Proposed RMP, which represents the agency's near-final decision on how to manage that portion of public lands. After one final period of review, the agency issues a Record of Decision (ROD), in which it formally approves a final RMP. Plaintiffs describe below how those processes unfolded for both the Buffalo and Miles City ARMPAs.

### I. The Federal Land Policy and Management Act of 1976

17.    As explained, FLPMA authorizes BLM to develop RMPs that guide the management of public lands administered by BLM.

18.    FLPMA's overarching command is that the "Secretary shall manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. §1732(a)(7). Consistent with that command, BLM develops RMPs that serve as land management blueprints and provide guidance for exactly how the public lands will be managed.

19.     FLPMA defines "multiple use" as managing "public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id.* §1702.

20.     FLPMA further orders that public lands "be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands." *Id.* §1732(a)(12).

21.     Congress defined the term "sustained yield" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." *Id.* §1702(h).

22.     FLPMA also authorizes Congress to "withdraw" federal lands. Under FLPMA, "withdrawal" means "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws." 43 U.S.C. §1702. But Congress can "withdraw" lands only in certain circumstances and only after following specific procedural safeguards. 43 U.S.C. §§1701, 1714. Any withdrawal over 5,000 acres can only be withdrawn for a "period of not more than twenty years." 43 U.S.C. §1714(c)(1).

23.     A withdrawal of mineral leasing falls within FLPMA's definition of a "withdrawal." *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987).

24.     FLPMA requires the Secretary to do two things relevant here when managing BLM lands. First, FLMPA requires the Secretary to coordinate with the State. It provides that "the Secretary shall … to the extent consistent with the laws governing the administration of the public lands, coordinate the … management activities of or for such lands with the land use planning and management programs … of the States and local governments within which the lands are located." 43 U.S.C. §1712(c)(9).

25.     Second, FLMPA requires the Secretary to make the final land use plans consistent "with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act." 43 U.S.C. §1712(c)(9).

26.     Under FLMPA's plain text, those two requirements—to coordinate with states and to make federal land-use plans consistent with state and local plans—are distinct requirements.

27.     This means that FLMPA requires BLM not only to coordinate directly with the State during the planning process but also to make its land use plans consistent with State and local plans to "the maximum extent he finds consistent with Federal law and the purposes of this Act." 43 U.S.C. §1712(c)(9). And BLM's Handbook says that any inconsistencies "must be resolved before the BLM issues a" Record of Decision, called by its acronym "ROD." BLM Land Use Planning Handbook H-1601-1 at III.A.12. While not binding on the agency or the parties, BLM's Land Use Planning Handbook provides guidance on how the agency will undertake the land use planning process. *See, e.g., Colo. Wild Horse & Burro Coal. v. Jewell*, 130 F. Supp. 3d 205, 214 (D.D.C. 2015) (explaining that BLM's wild horse handbook does not create a formal "legal duty" for the agency); *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1105 (D. Nev. 2018) (same). It summarizes the agency's practices in land use planning, and even the Supreme Court relies on it for guidance when evaluating land use plans. *See, e.g., Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 70 (2004).

28.     BLM has issued regulations to facilitate coordination with state governments for resource management planning under FLPMA. The objective of these regulations is to "promote the concept of multiple use management" and ensure that state and local governments can participate. 43 C.F.R. §1601.0-2.

29.     BLM regulations require the State Director to submit to the Governor of the State "the proposed plan or amendment and … identify any known inconsistencies with State or local plans, policies, or programs." 43 C.F.R. § 1610.4.3-2; *see also* 43 C.F.R. § 1610.3–2(e). The regulations also

require that resource management plans "be consistent with officially approved or adopted resource related plans … [of] State and local governments." 43 C.F.R. §1610.3-2.

30.    BLM's Land Use Planning Handbook requires the State Director to "notify the Governor in writing" any time it does not accept the recommendations of the Governor. 43 C.F.R. §1610.3-2(e).

## II. National Environmental Policy Act

31.    NEPA prescribes the process by which federal agencies analyze the environmental impact of proposed agency actions, including resource management plans.

32.    In 42 U.S.C. §4331, Congress declares it to be the "continuing policy of the Federal Government, in cooperation with State and local governments … to use all practicable means and measures … to create and maintain conditions under which man and nature can exist in productive harmony."

33.    NEPA's "obligation" requires every agency "to coordinate and consult with any other Federal or State agency, or [] to act, or refrain from acting contingent upon the recommendation or certification of any other Federal or State agency." *Id.* §4334.

34.    NEPA "also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

35.    To comply with NEPA, agencies may prepare an Environmental Impact Statement (EIS), which is a comprehensive document examining the impacts of a federal action on the environment.

36.    Under NEPA, if the agency prepares an EIS but then the agency decides to change its proposed action or new circumstances arise, an agency may issue a Supplemental Environmental

Impact Study (SEIS) where those changes or new circumstances "would result in significant environmental impacts that were not evaluated in the EIS." 23 C.F.R. §771.130(a).

### III. Mineral Leasing Act

37.    The MLA, as amended, authorizes the development of mineral deposits on federal lands. 30 U.S.C. §181. It governs the leasing of public lands for the extraction of these minerals, including coal. The resource management plan incorporates these requirements and provides specific guidance for where and how these mineral leases can be issued in a specific area consistent with the MLA.

38.    The MLA provides that "[d]eposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite …, or gas, and lands containing such deposits owned by the United States, … shall be subject to disposition" by BLM under the MLA's requirements. *Id.*

39.    The MLA's purpose is "[t]o promote the mining of coal, phosphate, oil, oil shale, and sodium on the public domain." Act of Feb. 25, 1920, ch. 85, §32, 41 Stat. 437. It was enacted "to obtain for the public reasonable financial returns on assets belonging to the public." *Mountain States Legal Found. v. Andrus*, 499 F. Supp. 383, 392 (D. Wyo. 1980).

40.    The MLA authorizes the Secretary to divide lands into leasing tracts "which will permit the mining of all coal which can be economically extracted in such tract." 30 U.S.C. §201.

41.    The MLA directs the Secretary that "he shall, in his discretion…offer such lands for leasing and shall award leases thereon by competitive bidding." 30 U.S.C. §201.

42.    The MLA further directs the Secretary to "reserv[e] and offe[r]" a reasonable number of leasing tracts to public bodies. 30 U.S.C. §201.

43.    Amendments to the MLA reinforce these federal policies.

44.    The Mineral Leasing Act for Acquired Land of 1947 made millions of new acres available for federal coal leasing. 30 U.S.C. §§351-52.

45.     And the Federal Coal Leasing Amendments Act of 1976 were adopted to protect federal coal leasing as part of the multiple-use land use planning process.

**IV. Other Relevant Federal Provisions**

46.     Before BLM issues any coal-extraction lease, any lands potentially subject to such a lease must be screened by BLM, which means BLM must determine whether potential federal coal lands are suitable for leasing. The screening can be done as part of BLM's development of the RMP, or the site's NEPA analysis, or some combination of the two.

47.     BLM's coal screening regulations establish certain steps that BLM must take to fully screen the land. 43 C.F.R. §3420.1-4(e). Screen 1 requires BLM to identify coal with potential for development. Screen 2 requires BLM to determine if any of the identified land is unsuitable for coal development. Screen 3 requires BLM to consider multiple-use conflicts. And Screen 4 requires BLM to consult with specific surface owners. BLM must consider each of these as part of assessing what lands are available for federal coal leasing in the planning area, which is the area subject to the resource management plan. 43 C.F.R. §3420.1-4(e).

48.     The agency must identify coal with the potential for development, determine if the lands are unsuitable for coal development, consider multiple use, and consult with specific surface owners. *Id.*

49.     Since 1982, BLM's Department Policy has been to "keep public lands open to mineral exploration and development." *See* BLM Manual 3031.06.A; U.S. Department of the Interior's National Materials and Minerals Program Plan and Report to Congress (April 1982).

50.     BLM prepared an Energy and Mineral Resource Assessment Manual, which ensures that mineral resource assessment "constitutes one part of the Geology, Energy, and Mineral (GEM) resources input into land-use decisions." BLM Manual 3031.01.

51.    BLM established the Abandoned Mine Land (AML) program to address issues asso-ciated with abandoned hard rock mines on federal land. Revenues from the active mines in the Powder River Basin help fund the AML. The BLM Manual recognizes that it must "[i]ntegrat[e] AML support into land-use planning efforts" and "ensure that reclamation" is completed in an "environmentally sound manner." BLM Manual 3720.1.2.H, 1.6.E.

* * * * *

52.    Congress's statutory frameworks prescribe these processes by which BLM must eval-uate—and the public can provide input into—when and how coal extraction occurs on federal public lands. Consistent with both FLPMA and NEPA, the agency solicits public input, engages with the State and its agencies, and develops draft proposals in the form of a proposed resource management plan and a draft environmental impact statement. These proposals consider concerns raised by the State and aim to work in conjunction with state and local laws, policies, and plans. As part of this process, the agency also evaluates its multiple-use objectives and environmental impacts by conducting a number of analyses, including a coal screen. Once the agency has addressed all the concerns and resolved any inconsistencies, it issues a ROD, which represents the final decision of the agency on how it will manage federal public lands in the area covered by the RMP.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Powder Riven Basin**

53.    The Powder River Basin is located in northeast Wyoming and southeast Montana.

54.    The Powder River Basin alone accounts for 85% of all coal produced on federal land. *Background*, U.S. Dep't of the Interior Bureau Land Mgmt., https://perma.cc/T3DM-3XA6.

55.    BLM issued two resource management plans to manage the Powder River Basin: (1) the Buffalo ARMPA, which applies to the federal land in the Wyoming part of the Powder River Basin; and (2) the Miles City ARMPA, which applies to the Montana part of the Powder River Basin.

56.     The Buffalo ARMPA covers 481,000 acres of subsurface federal mineral coal estate with 48.12 billion short tons of unleased recoverable federal coal. *See* Buffalo Record of Decision and Approved RMPA, BLM (Nov. 27, 2024), https://perma.cc/6GPG-WXKT.

57.     The Miles City ARMPA provides management guidance and direction for approximately 2.7 million acres of BLM-administered surface land and 11.7 million acres of subsurface federal mineral estate in 17 eastern Montana counties. *See* Miles City Record of Decision and Approved RMPA, BLM, at 1-1 (Nov. 27, 2024) (Nov. 27, 2024), https://perma.cc/J2JE-KGJ2.

58.     Coal production is essential to both Montana and Wyoming. Both States have developed policies and enacted statutes recognizing the importance of coal in their respective economies.

59.     Both States have State trust lands. In Wyoming, proceeds from development on these lands fund various public programs, including Wyoming's educational systems and other essential services. *See, e.g.* Wyo. Stat. §36-6-101.

60.     Montana's law, policies, and programs reflect the importance of the coal industry within the State. Montana has a constitutional duty to maximize the value from State trust lands for the benefit of Montana's public schools and other institutions. *See, e.g.*, Mont. Const. art. X, §§2, 11. To fulfill its fiduciary responsibility to the State trust land beneficiaries,[1] trust lands remain as working lands that are leased to generate revenue. DNRC's Forestry and Trust Lands Division oversees the management of 5.2 million surface acres and 6.2 million subsurface acres. Montana manages its trust land resources to produce revenues for trust beneficiaries while considering environmental factors

---

[1] Montana's trust beneficiaries are as follows: Common Schools (K-12), the University of Montana, Montana State University – Morrill Grant, Montana University – Second Grant, Montana Tech of the University of Montana, State Norman School (University of Montana Western), Public Buildings, Veterans Home, School for the Deaf & Blind, State Reform School (Pine Hills), Montana Development Center, Montana State Hospital, Public Land Trust Navigable Rivers, and Acquired Lands Trust.

and protecting the future income generating capacity of the land. Decl. of Trevor Taylor, ¶5, Exhibit 1.

61.    Any curtailment of leasing and development eliminates a critical source of revenue for these programs. *See* Taylor Decl. ¶¶7, 9-10.

62.    Wyoming law recognizes the importance of coal in the State. Wyoming created a comprehensive State energy policy that "[e]xpanded development of the State's natural resources through thoughtful, planned and environmentally sound extraction of energy related fuels and minerals." Wyoming Energy Commission, Energy Policy at 1-5 (2003).

63.    It is Wyoming's policy that "[t]he federal government arbitrarily restricting significant amounts of federal lands from public use is contrary to managing federal land under principles of multiple use and sustained yield." Wyo. Stat. Ann. §9-14-502(b)(ii).

64.    In 2019, Wyoming established the Wyoming Energy Authority to promote the development of natural resources, including coal. Wyo. Stat. Ann. §37-5-503(a)(i).

65.    Wyoming enacted the Natural Resource Protection Act, which establishes the State policy that restricting federal lands from public use violates FLPMA. Wyo. Stat. Ann. §9-14-302(b)(i).

66.    Wyoming created the Federal Natural Resource Policy Account to help Counties develop their own local land use plans. Wyo. Stat. Ann. §9-4-218(a)(viii). The State has provided substantial financial support to local leaders.

67.    Wyoming also enrolled in the Interstate Mining Compact, which is a multi-state governmental organization that seeks to balance the development of natural resources with mine safety and environmental protection.

68.    To further achieve its objectives, Wyoming relies on its Counties to provide their "special expertise" on all matters related to the "health, safety, welfare, custom, culture and socio-economic viability of a county." Wyo. Stat. Ann. §18-5-208.

69.     Counties take their role seriously. For example, Campbell County is within the Buffalo RMP. The Campbell County Commission has an extensive land use plan that governs, among other things, coal in the area. Campbell County is well suited to manage these coal deposits—coal mines in Campbell County alone produce approximately 96% of the coal mined in Wyoming. 2022 Campbell County Natural Resource Land Use Plan, 4.4.1, at 125 (July 21, 2022), https://www.campbellcount-ywy.gov/DocumentCenter/View/20880/2022-Natural-Resource-Land-Use-Plan-Final-Draft-and-Comments.

70.     Campbell County's land use plan focuses on the county's vast mineral resources. The plan calls for the "[c]ontinued exploration, development, and production of valuable mineral resources while maintaining and enhancing the natural resource environment." Campbell County Land Use Plan at 132 (2022). It further seeks to "[p]lan for short- and long-term sustained development of mineral resources to maximize economic return and minimize impacts." *Id.* And it calls for the "employment of credible scientific, engineering, and economic data in decisions regarding mineral resource devel-opment." *Id.*

71.     Johnson County is also within the Buffalo RMP. The Johnson County Commission has both a land use plan and resource management plan. Both plans support the continued extraction of coal resources. Johnson County Natural Resource Management Plan at 48 (Dec. 1, 2020), https://perma.cc/Q9UB-DPJ3; *see also* Johnson County Comprehensive Land Use Plan (Mar. 2005), https://perma.cc/75SC-SR5W.

72.     Historically, BLM has recognized the importance of relying on those with special ex-pertise. The agency created the Powder River Regional Coal Team, which is responsible for reviewing coal leasing applications and helps consult on "coal management decisions in the region." 43 C.F.R. §§3400.4, 3420.3-1(a).

73.    While BLM has engaged this Team on past land use planning processes, BLM did not consult with the Team on the Buffalo ARMPA.

74.    The Buffalo ARMPA is inconsistent with Wyoming law and policy as well as these individual county land use plans and resource management plans.

75.    Likewise, the Miles City ARMPA is inconsistent with Montana's laws and policies governing the coal industry.

76.    Montana levies a coal severance tax based on the value of coal produced in the state. *See* Mont. Code Ann. §15-35-103. Montana's Constitution established a permanent trust fund into which at least half of the coal severance tax must be deposited as principal, and the income and interest from the principal may be appropriated. *See* Mont. Const. art. IX, §5. The revenues from the coal severance tax are distributed to numerous programs, some of which support natural resource development projects and impact mitigation plans.[2] Montana's Governor Consistency Review of Miles City Final SEIS and Proposed RMPA, at 4 (July 16, 2024). The largest share of the coal severance tax (50 percent) goes to the coal severance tax fund, which earns interest for the benefit of local infrastructure projects and public school facilities. *Id.*

77.    Montana embraces an "all-of-the-above" energy strategy to provide reliable and affordable energy to communities. As part of that policy, public utility energy companies must develop a plan for meeting Montana's energy needs. *Id.* at 3. These plans are known as Integrated Resource Plans (IRPs), and they include an assessment of the need for additional resources and the utility company's plan for acquiring energy resources. *Id.* As one example, Northwestern Energy (NWE) published its latest IRP in 2023, and it identified the acquisition of additional capacity from the Colstrip

---

[2] The coal revenue trust fund supports Montana Conservation Districts, Montana State Parks, Montana Department of Environmental Quality Mine Permitting and Restoration, and the Montana Renewable Resource Loan Debt Service Fund. *See* Governor's Budget: Fiscal Years 2024-2025, 4-16 (2025 Biennium), https://perma.cc/7NSE-2JX7.

power plant as integral to its efforts to achieve short-term resource adequacy. *Id.* And the inability to lease federal or Montana coal reserves would impact NWE's future investment decisions regarding the Colstrip power plant. *Id.* at 3-4.

78.    Funding is currently available to Montana from the U.S. Army Combat Capabilities Development Command Army Research Laboratory to study the potential of extracting Rare Earth Elements (REEs) from coal deposits. DNRC Protest of Miles City SEIS and RMPA, at 5 (June 17, 2024). DNRC is currently coordinating with the Montana Bureau of Mines and Geology, who is financed by the Army Research Laboratory, to access State trust land surface mineral tracts and sample coal outcrops for REEs, but eliminating federal coal leasing in the Powder River Basin would restrict Montana's ability to allow these critical resource to be developed for the benefit of the trust.

**Western Organization of Resource Councils Litigation (WORC I and II)**

79.    In 2015, BLM issued a Record of Decision that approved both the Miles City and Buffalo Field Office RMPs. *See* Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region, Dep't of Interior (Sept. 2015), https://perma.cc/9S8K-3E55. For the Buffalo Field Office, BLM selected the No Leasing Alternative, which permitted mineral leasing on federal land. BLM determined that "it best achieve[d] the mix of multiple uses" because it places some constraints on resources uses while still permitting leasing. *Id.* at 3-16. For the Miles City Field Office, BLM selected Alternative E, which permitted resource uses (e.g., energy and mineral development and other commodity uses) while providing protection to sensitive resources like the Greater Sage-Grouse habitat. *Id.* at 3-19. BLM determined that Alternative E "provided the most balanced approach to multiple-use and sustainability of BLM-administered lands while offering a high degree of resource protection in sensitive areas." *Id.*

80.    Environmental groups sued under NEPA, arguing that BLM—among other things—failed to consider adequate alternatives, failed to look at the indirect impacts of combustion emissions,

failed to consider greenhouse gas emissions, and failed to look at the cumulative impacts. Amended Complaint, *Western Organization of Resource Councils v. BLM*, cv-16-21-GF-BMM, Doc. 66 (D. Mont. Mar. 31, 2017) (*WORC I*).

81.    In 2018, the Montana federal district court determined that BLM violated NEPA. It directed BLM to prepare a supplemental EIS for both management plans and ordered that any new or pending leases of coal in those two areas must undergo comprehensive environmental analyses. Order, *Western Organization of Resource Councils v. BLM*, cv-16-21-GF-BMM, Doc. 124 (D. Mont. July 31, 2018).

82.    In 2019, BLM completed each supplemental EIS and approved Resource Management Plan Amendments. *See* Buffalo 2019 ROD, *Western Organization of Resource Councils v. BLM*, 4:20-cv-76, Doc. 25-2 (D. Mont. Jan. 11, 2021) (*WORC II*); Buffalo 2019 FSEIS, *WORC II*, Doc. 25-3; Miles City 2019 ROD, *WORC II*, Doc. 25-5; Miles City 2019 FSEIS, *WORC II*, Doc. 25-6. The Buffalo ARMPA approved Alternative B, which permitted the expansion of existing mines and provided an opportunity for future new uses of coal. The Miles City RMPA likewise approved Alternative B, which "provide[d] the best balance of resource conservation, while not foreclosing future opportunities for development." Miles City 2019 ROD at 1-4.

83.    In BLM's 2019 Buffalo FSEIS, BLM recognized that additional coal leasing was needed. The agency acknowledged that "[m]aking the entire decision area unacceptable for further consideration for coal leasing" would not satisfy FLPMA or MLA. Buffalo 2019 ROD at 1-2.

84.    In BLM's 2019 Miles City FSEIS, BLM likewise recognized the importance of retaining opportunities for future development, selecting Alternative B over Alternative C (which identified fewer acceptable acres for the purposes of reducing greenhouse gas emissions) because it provided a better "balance of resource conservation" while retaining "future opportunities for development." Miles City 2019 ROD at 1-4.

85.     A nearly identical group of environmental plaintiffs sued again, asserting that BLM failed to consider alternatives that would result in less coal development and failed to consider air pollution. Second Amended Complaint, *Western Organization of Resource Councils v. BLM*, 4:20-cv-76, Doc. 37 (D. Mont. Mar. 30, 2021). As summary judgment briefing neared conclusion, BLM requested that the district court remand the agency's decision so that BLM could undertake new supplemental analyses and re-examine the challenged decisions. Notice of Intent to Move for Remand, *Western Organization of Resource Councils v. BLM*, 4:20-cv-76, Doc. 60 (D. Mont. Feb. 25, 2022).

86.     The district court acknowledged that district courts "generally grant an agency's request for remand," particularly when—as in *WORC II*—the agency claims that it will address the deficiencies in Plaintiffs' claims. Order, *Western Organization of Resource Councils v. BLM*, 4:20-cv-76, Doc. 71, at 8 (D. Mont. Aug. 3, 2022). The district court nevertheless denied BLM's request, in part, because BLM made "no specific guarantees to consider downstream emissions in its motion" and failed "to define what NEPA alternatives it [would] consider." *Id.* at 10.

87.     The district court then determined that because the Council on Environmental Quality's regulations required BLM to consider "indirect" environmental effects and to evaluate additional alternatives, BLM needed to complete a new coal screening and NEPA analysis. Order, *Western Organization of Resource Councils v. BLM*, 4:20-cv-76, Doc. 71, at 10-19 (D. Mont. Aug. 3, 2022) (citing 40 C.F.R. §1502.14(a) and 40 C.F.R. §1502.16(b)). These regulations have since been declared invalid. *See Marin Audubon Soc'y v. FAA*, --F.4th ---, 2024 WL 4745044 (D.C. Cir. Nov. 12, 2024).

88.     Finally, unsatisfied with BLM's second NEPA analysis, the district court required the agency to undertake a new NEPA analysis yet again. The court specifically instructed BLM to consider both a no coal leasing and limited coal leasing alternative. Order, *Western Organization of Resource Councils v. BLM*, 4:20-cv-76, Doc. 71, at 20 (D. Mont. Aug. 3, 2022). The district court also specified that BLM

must disclose climate and non-climate health impacts of burning fossil fuels as part of its NEPA review. *Id.*

**Development of the Buffalo ARMPA**

89.    BLM published its notice of intent (NOI) for the Buffalo Draft SEIS/Potential RMPA on October 3, 2022. 87 Fed. Reg. 59818.

90.    An NOI describes an agency's proposed action, the scoping process, and ways in which members of the public can participate. During this scoping period, the public can submit comments and feedback on the agency's proposed action. The scoping process occurs at the start of BLM's planning process before the agency has even drafted an environmental impact statement or proposed an actual resource management plan.

91.    BLM is the lead agency for the Buffalo SEIS and RMPA. As the lead agency it must coordinate with cooperating agencies while developing a resource management plan.

92.    The agency sent letters to cooperating agencies on August 25, 2022. Final Scoping Report Buffalo RMP, Bureau of Land Management (Dec. 2022), https://perma.cc/E8QH-QPYU. This serves as BLM's formal invitation to participate in the resource management planning process.

93.    At the invitation of BLM, the following 13 agencies are cooperating agencies: the Campbell County Commission, the Johnson County Commission, the Campbell County Conservation District, the Wyoming Office of the Governor, the Office of Wyoming Senator John Barrasso, the Office of Wyoming Senator Cynthia Lummis, the Office of Wyoming Representative Harriet Hageman, the Wyoming Department of Agriculture, the Wyoming Department of Environmental Quality, the Wyoming Game and Fish Department, the United States (US) Environmental Protection Agency Region 8, the US Department of the Interior National Park Service, and the US Department of the Interior Office of Surface Mining Reclamation and Enforcement.

94.    The Buffalo Field Office held only one public meeting in connection with its resource management planning process for the Buffalo RMPA. That occurred in Gillette, Wyoming, on October 17, 2022.

95.    In December 2022, the Buffalo Field Office issued its Final Scoping Report, which summarizes the public input gathered during the scoping period and identifies potential issues that need to be analyzed further.

96.    In May 2023, the Buffalo Field Office issued a Draft SEIS and Potential RMPA. 88 Fed. Reg. 29691 (May 8, 2023); *see also* Buffalo Draft SEIS and Potential RMPA, BLM (May 2023), https://perma.cc/L3YB-UKFT.

97.    In the Draft SEIS and Potential Buffalo RMPA, BLM considered three alternatives to manage 481,000 acres of Coal Development Potential Area (CDPA). This area contains 4.36 billion short tons of leased, unmined, recoverable coal and 48.12 billion short tons of unleased recoverable federal coal.

98.    Alternative A was the No Leasing Alternative, which does not allow BLM to accept new coal lease applications. It results in the CDPA being unacceptable for future consideration of federal coal leasing. Put more simply: it eliminates future coal leasing in the Powder River Basin.

99.    Alternative B was the No Action Alternative, which would make 48.01 billion short tons of BLM-administered recoverable coal available for future leasing.

100.    Alternative C was the Limited Leasing Alternative, which would make 1.24 billion short tons of BLM-administered recoverable coal available for future leasing. But the remaining recoverable coal in the Powder River Basin would remain unavailable for leasing.

101.    In BLM's Draft SEIS and Potential RMPA, BLM stated that it supported a dual preferred alternative (Alternative A and Alternative C). 88 Fed. Reg. at 29692. This means that it thought

either Alternative A (No Leasing) or Alternative C (Limited Leasing) would achieve the agency's objectives.

102.    After BLM issued the Draft SEIS and Potential RMPA, the public had an opportunity to comment. Many commenters expressed serious concerns about the No Leasing Alternative. *See* Buffalo Final SEIS and Proposed RMPA, BLM, Table H-1 (May 2024), https://perma.cc/584J-LRP4 (discussing the comments received).

103.    In May 2024, after the public submitted the comments and concerns discussed in the immediately preceding paragraph, BLM issued a notice in the Federal Register that the Proposed RMPA and Final SEIS were available for review. 89 Fed. Reg. 43431 (May 17, 2024). The agency made the Proposed RMPA and Final SEIS available online on BLM's ePlanning project website. *See* Buffalo Final SEIS and Proposed RMPA, https://perma.cc/584J-LRP4.

104.    The Proposed RMPA and FSEIS included the FSEIS and a high-level description of the agency's proposed course of action in the FSEIS, but it did not contain the actual language of the RMPA.

105.    This differs from past practice. Historically, BLM has made available draft language to proposed RMPAs, consistent with its own regulations. *See* 43 C.F.R. §1610.4-7; *see also* BLM Land Use Planning Handbook H-1601-1, Appendix E; *id.* at III.A.10; *see also, e.g.*, Converse County Oil and Gas Project and RMP Amendment, Appendix G, Proposed RMP Appendices (July 30, 2020). But here, BLM did not release or share proposed language it intended to adopt for the No Leasing Alternative.

106.    In the FSEIS, BLM changed course from a dual preferred alternative and stated that it preferred Alternative A, which would eliminate future coal leasing in the Powder River Basin. 89 Fed. Reg. at 43432.

107.    In the FSEIS, BLM explained the coal screen for each of the proposed alternatives. Screen 1 considered which lands have development potential. Because it simply identifies the total

area with coal development potential, Screen 1 is the same under all three proposed alternatives. It showed that 52.66 billion short tons of coal (out of 61.30 billion short tons of coal, *see* Screen 1) exist with development potential. Buffalo Final SEIS and Proposed RMPA at ES-6.

108.    Screen 2 considered which land is unsuitable for development. Like Screen 1, Screen 2 was the same under all three proposed alternatives—it merely identifies what land has development potential under Screen 1 but is nevertheless unsuitable for coal mining. Under Screen 2, BLM excluded only 940 acres of the total 481,000 acres in the potential coal development area. Buffalo Final SEIS and Proposed RMPA at A-7.

109.    Screen 3 was where the analysis between the three alternatives varied. BLM varied each of the alternatives by "refining the multiple-use coal screen (Screen 3) to consider greenhouse gas emissions as a nexus for climate change." Buffalo Final SEIS and Proposed RMPA at ES-6. In other words, each alternative considered greenhouse gas emissions to a different extent.

110.    For the No Leasing Alternative, under Screen 3, BLM concluded that none of the coal suitable for coal mining (48.12 billion short tons) passed Screen 3's multiple-use requirement. Buffalo Final SEIS and Proposed RMPA at ES-6. This means that even though the land has development potential (Screen 1) and is suitable for development (Screen 2), the coal cannot be mined because it does not meet Screen 3's multiple-use requirement when prioritizing a reduction in greenhouse gas emissions to the maximum extent possible. Even though BLM's multiple-use and sustained-yield mandate requires BLM to balance "public lands and their resource" values, 43 U.S.C. §§1701-02, BLM explained that the land was unsuitable for leasing because BLM seeks to "reduce greenhouse gas (GHG) emissions as a proxy for climate change." Buffalo Final SEIS and Proposed RMPA at ES-6. BLM did not explain which "resource value" relates to greenhouse gas emissions or climate change. 43 U.S.C. §1702(c). BLM also failed to explain how its focus on greenhouse gas emissions outweighed all the other resource values it is supposed to consider under the multiple-use mandate. *Id.*

111.    In the FSEIS, BLM stated that "[f]or BLM-administered federal coal resources be-neath state lands, the BLM will consult with the Wyoming governor's office during the governor's consistency review for the Final Supplemental EIS and Potential RMPA, in accordance with 43 C.F.R. § 3420.1-7." Buffalo Final SEIS and Proposed RMPA at A-3 (2024). But BLM failed to contact the Office of the Wyoming Governor after publishing the FSEIS. Governor Gordon initiated the con-sistency review process only after seeing the Buffalo FSEIS posted on BLM's webpage.

112.    The first official correspondence from BLM regarding the consistency review occurred only after the Governor submitted his Consistency Review.

113.    The State Director concedes this outreach never happened. Letter from Andrew Ar-chuleta, BLM Wyoming State Director, to the Honorable Mark Gordon, Governor of Wyoming, at 2 (Aug. 16, 2024), https://perma.cc/3HM7-6ASS ("BLM Buffalo Consistency Review Response").

114.    The Governor's consistency review constituted the statutorily guaranteed chance for Governor Gordon to identify inconsistencies between the No Leasing Alternative selected in the Pro-posed Buffalo ARMPA and FSEIS and Wyoming's constitution, statutes, programs, and policies. *See* 43 U.S.C. §1712(c)(9).

115.    In the Governor's Consistency Review, available at https://perma.cc/TQY6-D84G, he identified the following inconsistencies:

    a.  The No Leasing Alternative interferes with the Wyoming Constitution's policy of sup-porting public services with severance taxes from federal coal development;

    b.  The No Leasing Alternative is inconsistent with State law requiring the optimization of its State trust lands;

    c.  The No Leasing Alternative is inconsistent with Wyoming Energy Policy;

    d.  The No Leasing Alternative is inconsistent with the Wyoming Environmental Quality Act;

    e.  The No Leasing Alternative conflicts with the State's Interstate Mining Compact stat-ute;

f.   The No Leasing Alternative is inconsistent with the Natural Resource Protection Act;

g.   The No Leasing Alternative is inconsistent with Campbell County's Plan;

h.   The No Leasing Alternative is inconsistent with Johnson County's Plan;

i.   The No Leasing Alternative is inconsistent with FLPMA;

j.   The No Leasing Alternative is inconsistent with the Mineral Leasing Act;

k.   The No Leasing Alternative is inconsistent with findings in previous land use plans;

l.   The No Leasing Alternative is inconsistent with federal regulations on land use planning and federal/state cooperation;

m.   The No Leasing Alternative is inconsistent with BLM's coal screening regulations;

n.   The No Leasing Alternative is inconsistent with BLM's policies and DOI's Strategic Plan;

o.   The No Leasing Alternative is inconsistent with federal investments and programs promoting advanced coal technologies;

p.   The No Leasing Alternative is inconsistent with NEPA.

116.   In addition, the Governor noted that closing federal coal leasing will strand minerals in adjoining State trust lands, including on lands adjacent to mining operations in land tracts T41N, R71W and T41N, R72W (identified at Buffalo Final SEIS and Proposed RMPA at 1-3). This, in turn, violates Wyoming's constitutional and statutory objectives.

117.   The Governor also noted that BLM failed to consult with WDEQ, which has an Air Quality Division specifically devoted to monitoring and enhancing the air quality within the State of Wyoming.

118.   BLM's State Director sent a response to the Governor's Consistency Review (on behalf of BLM). In that response, the BLM State Director did not address the inconsistencies between the FSEIS and State and County law, regulation, or policy. In fact, the State Director conceded that the No Leasing Alternative "may not be consistent with Wyoming's Constitutional Policy and the Wyoming Environmental Quality Act." BLM Buffalo Consistency Review Response at 1. Without

addressing these inconsistencies, the State Director then concluded that the No Leasing Alternative *is* consistent with the policy and priority of BLM.

119.    In the State Director's response, BLM conceded that "nonfederal mining would likely stop after all available federal coal is mined out." BLM Buffalo Consistency Review Response at 2. Yet BLM also stated that its decision will "have no impact on the management decision for State trust lands," even though these State trust lands are within the potential coal development area. *Id.* BLM's conclusion fails to address the inconsistencies between the RMPA and State law, and it creates new inconsistencies between BLM's conclusions and the evidence before it.

120.    In the State Director's response, BLM also did not address the inconsistencies between the Buffalo FSEIS and federal law, regulation, and policy. Rather, the State Director stated that the issues were "not ripe for discussion as legal arguments" and "are outside the scope of a Governor's consistency review and due to the fact, the BLM is still in a pre-decisional phase with the record of decision expected to be issued in December 2024." BLM Buffalo Consistency Review Response at 1,4, 6.

121.    In the State Director's response, the State Director also dismissed Wyoming's concerns about how the No Leasing Alternative prevents the State from administering its reclamation and abandoned mine land program. The State Director stated that this was not brought up during scoping or the SEIS public review process and dismissed the concerns. BLM Buffalo Consistency Review Response at 3. But the Wyoming Department of Agriculture and other members of the public did raise concerns about reclamation, *see* Final Scoping Report at C-3, C-15, C-23 (Dec. 2022), and in any event, the Governor can raise any issues during the Consistency Review process, even those that were "not raised during the public participation process." 43 C.F.R. §1610.3-2(e).

122.    In the State Director's response, the State Director also concluded—without explanation—that the proposed RMPA is consistent with FLPMA and MLA. BLM Buffalo Consistency Review Response at 4.

123.    In addition to identifying important inconsistencies, the Wyoming Governor also provided several recommendations to BLM:

    a.  Provide the draft language of the RMPA;

    b.  Consider WDEQ's proposed alternative:

    c.  Consider local land use plans in their entirety;

    d.  Reconcile the RMPA with State and federal law;

    e.  Select the No Action Alternative, which BLM previously stated was consistent with federal and State law.

124.    BLM did not acknowledge or explain why BLM did not accept the Governor's recommendations.

125.    The State Director's responses to the remaining arguments contained in the Governor's Consistency Review reveal that his response was strictly pro forma—the decision had already been made to adopt the No Leasing Alternative. For example, in response to the Governor's note about the Interstate Mining Compact, the State Director simply identified the cooperating agencies and the various hearings and public comment opportunities. BLM Buffalo Consistency Review Response at 3-4. This says nothing of the substance of these comments or that the agency gave local interests due consideration. Rather, it only confirms that BLM went through the motions of collecting comments.

126.    The Proposed RMPA also was inconsistent with both the Campbell County and Johnson County land use plans.

127.    Campbell County's Land Use Plan provides as its objective: "[e]xcept for Congressional withdrawals, federally managed lands shall remain open and available for mineral resource

exploration, development and production, unless administrative withdrawal or other action is neces-
sary to protect the national security and withdrawal procedures are fully followed." Campbell County
Land Use Plan at 133 (2022), https://perma.cc/K9U8-A2WA. While BLM previously identified no
inconsistencies between this language and federal law in past reviews, BLM now concluded that Camp-
bell County's Land Use Plan is not consistent with the "purposes, policies, and programs of federal
laws and regulations applicable to BLM-administered lands." Buffalo Final SEIS and Proposed RMPA
at 1-14. BLM provides no explanation for why the Land Use Plan's objective is now inconsistent with
federal law when the same language previously was consistent with federal law.

128.    The Campbell County Land Use Plan seeks to "[p]reserve and promote resource-based
industries" and provide for the "[c]ontinued exploration, development, and production of valuable
mineral resources." Campbell County Land Use Plan at 2, 132. And BLM recognized that Campbell
County is "historically dependent on mineral development for direct and indirect economic contribu-
tions." Buffalo Final SEIS and Proposed RMPA at 3-91 (2024). Yet BLM adopted the No Leasing
Alternative without estimating the full economic impact or considering the many ways in which its
decision conflicts with federal law. *Id.* at 1-14.

129.    Despite all these conflicts with Campbell County's Land Use Plan, BLM simply con-
cluded that the No Leasing Alternative is inconsistent with Campbell County's policy contained in its
land use plan. Buffalo Final SEIS and Proposed RMPA at 1-14. BLM makes no other reference to
Campbell County's 284-page land use plan.

130.    Like Campbell County, Johnson County makes coal a priority in its Land Use Plan.
Johnson County Natural Resource Management Plan at 48 (2020), https://perma.cc/YS74-YP4S. It
states that the "[u]se of clean and efficient coal powered electricity continues in the County for as long
as coal is the most affordable and efficient source of power in the County." *Id.* The FSEIS does not
dispute that the No Leasing Alternative is inconsistent with Johnson County's objective. Buffalo Final

SEIS and Proposed RMPA at 1-14. State Director's response conceded that it cannot estimate the impact of its No Leasing Alternative on Johnson County residents and did not dispute that this is inconsistent with Johnson County's plan. BLM Buffalo Consistency Review Response at 6.

131. BLM's responses to the concerns raised by the State of Wyoming and its Counties shows that it did not seek to engage in meaningful coordination or make the RMPA consistent with Wyoming law or the local land use plans.

132. While the consistency review was ongoing, the parties were also engaged in protests. The protest period follows publication of the proposed RMPA and FSEIS in the Federal Register and allows interested parties to provide feedback on the proposed plan. Unlike the Governor's Consistency Review, the protest period is open to any entity that has an interest in or may be adversely affected by the plan. 43 C.F.R. §1610.5-2. Whereas the scoping process purports to allow the public to provide feedback on potential issues before BLM releases the draft SEIS, the protest period is supposed to allow public feedback after the final SEIS.

133. The following parties filed protests to the proposed RMPA following the release of the proposed RMPA and FSEIS: Wyoming Department of Environmental Quality, National Mining Association, Navajo Transitional Energy Company, Navajo Transitional Energy Company, Senator Daines, Wyoming County Commissioners Association, Campbell County Board of Commissioners, Converse County Board of Commissioners, and Johnson County Board of Commissioners.

134. The protests mirrored many of the same concerns raised by the Governor during his consistency review and identified above.

135. Beyond the concerns already identified by the Governor and the counties, WDEQ's protest noted that the Buffalo ARMPA will substantially reduce the primary funding source for AML as Wyoming is the largest contributor to funding of AML reclamation work. WDEQ Protest at 3 (June 17, 2024), https://perma.cc/4WVV-TEMV. In FY 2023, fees from Wyoming coal mining generated

$53,492,802 in total AML program funding. Todd Parfitt Decl. ¶12, Exhibit 2. For FY 2023, Wyoming will receive about $25.22 million for abandoned mine reclamation work. *Id.* But in the FSEIS, BLM does not mention or analyze this issue, especially with respect to its no leasing alternative.

136.    WDEQ's protest also identified a few other key problems. For example, the RMPA failed to analyze costs and emissions that will result from companies switching to other fuel sources. This ignores the fact that coal-powered power plants provide about 20% of our Nation's base load affordable electrical energy. Whereas the potential coal development area produces low-sulfur coal, many other regions produce high-sulfur coal. Low-sulfur coal can help reduce pollution and green-house effects. By shutting down low-sulfur coal development, BLM will force entities to turn to high-sulfur coal.

137.    WDEQ's protest also noted the harm to human health as a result of the Proposed RMPA. WDEQ Protest at 5-6. The RMPA will decrease funding for Wyoming health programs and a decrease funding for the Black Lung Disability Trust.

138.    WDEQ's protest asked BLM to consider as an alternative an action that would remove the coal development potential area boundary, coal acreage, and surface acreage through a formal withdrawal proceeding.

139.    Several counties—Campbell, Johnson, and Converse Counties—all similarly filed a protest. The counties identified a number of projects in various stages that use Powder River Basin coal as raw material for advanced technology. Protest of Counties' Boards of Commissioners at 6-11, https://perma.cc/D5DE-MKZH. The counties also explained that BLM failed to adequately consider thermal and other non-thermal uses of coal. *Id.* at 11-15.

140.    On September 20, 2024, BLM Headquarters quietly published the Director's Protest Resolution Report for the Buffalo Field Office SEIS and RMPA.

141.    The BLM State Office learned of this report on or around Thursday, September 26, 2024. The BLM State Office sent the report to the Office of the Wyoming Governor shortly after learning of the report.

142.    Upon information and belief, this report was originally available online on or around September 20, 2024, but it was removed at some point in early October, at which point the report was inaccessible.

143.    On November 13, 2024, BLM Headquarters quietly republished the Director's Protest Resolution Report for the Buffalo Field Office SEIS and RMPA. Buffalo Protest Resolution Report, BLM (Nov. 13, 2024), https://eplanning.blm.gov/public_projects/2021239/200533937/20123420/251023400/Buffalo%20FSEIS%20PRMPA%20Protest%20Report.pdf.

144.    The November 13 version is identical in every way to the September 20 version, except for the date.

145.    In this report, BLM rejected all the arguments in the protests and states that "no changes to the Buffalo FSEIS/PRMPA were necessary." Buffalo Protest Resolution Report at 1; *see also* Buffalo Record of Decision and Approved RMPA, BLM, 1-6 (Nov. 27, 2024), https://perma.cc/6GPG-WXKT ("The BLM Assistant Director for Resources and Planning resolved the protests without making changes to the Proposed RMP Amendment.").

146.    The flaws in BLM's reasoning in the development of the Buffalo RMPA become even more apparent when contrasted with the proposed RMPA and FEIS that BLM previously issued for the North Dakota Resource Management Plan. The prior North Dakota RMP proposal identified Alternative B (a limited leasing option) as the preferred alternative. Alternative B would "close low oil and gas development potential areas and State-designated drinking water source protection areas" to coal leasing. 89 Fed. Reg. 65391, 65392 (Aug. 9, 2024). In other words, coal development is permissible

in North Dakota, but it is not permissible in Wyoming, allegedly because of climate change concerns. This marked a notable departure from BLM's preliminary decisions in Wyoming and confirmed BLM's internal inconsistencies in evaluating and considering coal leasing.

147.    Nevertheless, BLM persisted in its aggressive campaign against the Powder River Basin.

148.    On November 27, 2024, BLM issued its Record of Decision (ROD) with the Approved RMPA. Buffalo Record of Decision and Approved RMPA, BLM (Nov. 27, 2024), https://perma.cc/6GPG-WXKT.

149.    The ARMPA adopted the No Leasing Alternative.

150.    This will effectively cause new coal leasing—even of maintenance areas—to cease immediately.

151.    BLM's rationale for its decision is that it is consistent with executive orders about climate change, the U.S. energy market is moving away from coal, and Wyoming coal production has decreased. None of these explanations justify the agency's decision to end new coal leasing altogether.

152.    The ROD repeats the same error as the FSEIS and Proposed RMPA. It ignores the inconsistencies identified during the consistency review, and it fails to address the other recommended courses of action.

153.    This decision is inconsistent with FLPMA, NEPA, and the MLA, and federal regulations governing the resource management planning process.

154.    This decision is inconsistent with Wyoming state law.

155.    This decision is inconsistent with local land use plans.

156.    The decision ignores that the land has substantial development potential (Screen 1) and very little of the land is unsuitable for development (Screen 3). Buffalo ARMPA at A-9. It further

ignores the results of Screen 4, which confirmed "[t]here is no significant opposition to mining in the areas" by surface owners of the land. Buffalo ARMPA at A-8.

157.    The ARMPA strands minerals in adjoining State trust lands. Buffalo ARMPA at A-11. This interferes with the State's ability to lease State trust land.

158.    The ARMPA also is internally inconsistent. BLM explains that it is working with Wyoming to expand Wyoming's renewable energy and carbon capture projects, which BLM suggests offsets the impact of the Buffalo ARMPA to Wyoming's coal industry. Buffalo ARMPA at 1-6. At the same time, BLM says that these carbon capture projects are not developed enough, and should they become "commercially feasible," BLM may "revisit their decision through another RMP amendment or revision." Buffalo ARMPA at 1-2. In other words, BLM can use these carbon capture projects to justify its final decision on the back-end by offsetting the harm to Wyoming's energy portfolio, but BLM refuses to factor in these same carbon capture projects on the front-end as part of its analysis in determining whether coal leasing can continue.

159.    Wyoming has a direct financial stake in federal coal leasing on land within the State of Wyoming.

160.    The RMPA will decrease funding for the federal coal miner pension fund settlement.

161.    The RMPA will eliminate 5,100 direct employment jobs and even more indirect employment jobs. Parfitt Decl. ¶10.

162.    It will also cause a substantial loss of revenues. Parfitt Decl. ¶¶7-9.

163.    In 2022, coal mining from the PRB alone resulted in payments to Wyoming in $13.77 Million in ad valorem taxes, $153 Million in severance taxes, and $183 Million in Wyoming's share of federal mineral royalties. Parfitt Decl. ¶¶7-9.

164.    This funding directly supports essential services in Wyoming, including schools, local government, and important state infrastructure. Parfitt Decl. ¶¶7-9.

165.    The Buffalo ARMPA will decrease contributions to the AML Fund. For Fiscal Year 2023, fees from Wyoming coal mining generated over $53 Million in total AML program funding. For that same period, Wyoming will receive about $25.22 Million for abandoned mine reclamation work. This funding will substantially decrease. Parfitt Decl. ¶12.

166.    The Buffalo ARMPA will harm Wyoming's ongoing reclamation needs which threatens public safety and harms the very lands that BLM allegedly seeks to protect.

167.    Wyoming counties will also suffer. In Campbell County, for example, the mining industry accounts for approximately 20% of total employment in the County. Protest of Counties' Boards of Commissioners at 20. The Buffalo ARMPA will substantially reduce the number of jobs available. In addition, the revenue generated for Campbell County will substantially decrease as a result of the Buffalo ARMPA. *Id.* The Buffalo ARMPA will also impede ongoing research projects in Campbell County, including projects that seek to reduce carbon emissions and projects that utilize coal as raw material for advanced technology. *Id.* at 6-9.

168.    Likewise, in Johnson and Converse Counties, the ARMPA will have serious consequences. Both counties will face a loss in jobs, revenue, and investments in projects going towards solving some of the very concerns raised by BLM, including greenhouse gas emissions and climate change. *Id.* at 6-9, 20-21.

**Development of the Miles City ARMPA**

169.    BLM published its NOI for the Miles City Draft SEIS/Potential RMPA on October 3, 2022. 87 Fed. Reg. 59818.

170.    As discussed above, an NOI describes an agency's proposed action, the scoping process, and ways in which in which members of the public can participate. During this scoping period, the public can submit comments and feedback on the agency's proposed action. The scoping process

occurs at the start of BLM's planning process before the agency has even drafted an environmental impact statement or proposed a resource management plan.

171.    BLM is the lead agency for the Miles City SEIS and RMPA. As the lead agency, it must coordinate with cooperating agencies while developing a resource management plan.

172.    The agency sent letters to cooperating agencies on September 28, 2022. Final Scoping Report, Miles City Field Office RMP, Bureau of Land Management, at 1-2 (Dec. 2022), https://perma.cc/8PSZ-6924. This serves as BLM's formal invitation to participate in the resource management planning process. The NOI identified 9 potential cooperating agencies: the Montana Office of the Governor; Montana Department of Environmental Quality; Montana Department of Natural Resources and Conservation; Montana Fish, Wildlife, and Parks; Big Horn County, Montana; Rosebud County, Montana; U.S. Environmental Protection Agency Region 8; Office of Surface Mining, Reclamation and Enforcement; and U.S. Fish and Wildlife Service. 87 Fed. Reg. at 59820.

173.    At the invitation of BLM, the following 6 agencies are cooperating agencies: Custer County, Montana; Rosebud County, Montana; McCone County, Montana; Richland County, Montana; U.S. Environmental Protection Agency Region 8; and Office of Surface Mining, Reclamation and Enforcement.

174.    The Miles City Field office held only one public meeting in connection with its resource management planning process for the Miles City RMP. That occurred in Miles City, Montana, on October 18, 2022.

175.    In December 2022, the Miles City Field Office issued its Final Scoping Report, which summarizes the public input gathered during the scoping period and identifies potential issues that need to be analyzed further.

176.    In May 2023, the Miles City Field Office issued a Draft SEIS and Potential RMPA (Draft SEIS/RMPA). 88 Fed. Reg. 29689 (May 8, 2023), *available at* https://perma.cc/8HCK-JHMC.

177.    In the Miles City Field Office Draft SEIS/RMPA, BLM considered four alternatives to determine the suitability of coal leasing on roughly 1.745 million acres of BLM-administered federal coal in the decision area. Miles City Draft SEIS/RMPA, App. A, at A-1–A-2.

178.    Alternative A was the No Action Alternative, which left open 1,214,380 acres as suitable for further consideration for coal leasing. *Id.* Table ES-1, at ES-4.

179.    Alternative B was one approach to Limited Leasing, which left open 57,940 acres as suitable for further consideration for coal leasing. *Id.*

180.    Alternative C was another approach to Limited Leasing, which left open 810 acres as suitable for further consideration for coal leasing. *Id.*

181.    Alternative D was the No Leasing Alternative, which would not allow BLM to consider new coal leasing applications. *Id.* In other words, it eliminates all future coal leasing in the Powder River Basin.

182.    In Miles City's Draft SEIS/RMPA, BLM said it supported a co-preferred alternative (Alternative B and Alternative D), which means that it thought either Alternative B (No Leasing) or Alternative D (No Leasing) would achieve the agency's objectives. *Id.* at ES-5.

183.    After BLM issued the Draft SEIS and Potential RMPA, the public had an opportunity to comment. Many commenters expressed serious concerns about the No Leasing Alternative. *See* Miles City Final SEIS and Proposed RMPA (Miles City Final SEIS/Proposed RMPA), App. F, Table F-1 (May 2024), *available at* https://eplanning.blm.gov/eplanning-ui/project/2021155/570.

184.    In May 2024, after members of the public submitted their comments and concerns with the Draft SEIS and Potential RMPA, BLM issued a notice in the federal register that the Final SEIS and Proposed RMPA were available for review. 89 Fed. Reg. 43432 (May 17, 2024). BLM made the document available on its ePlanning project website. *See* Miles City Final SEIS/Proposed RMPA, *available at* https://eplanning.blm.gov/eplanning-ui/project/2021155/570.

185. In the Final SEIS/Proposed RMPA, BLM changed course from a co-preferred alternative and said that it preferred Alternative D, which would eliminate future federal coal leasing in the Powder River Basin. *See id.* at ES-5.

186. Screen 1 considers which lands have coal development potential. It showed that there are approximately 11.7 million acres of BLM-administered federal coal in the decision area, of which 1.745 million acres were carried forward under Screen 1. *See id.* App. A, at A-3; *see also id.* Ch.2, Table 2-1; 2-3; 2-4; 2-6.

187. Screen 2 considers which land is unsuitable for development. Under Screen 2, the alternatives excluded the following number of acres as unsuitable for all methods of coal mining without exception: Alternative A (190,590 acres); Alternative B (202,320 acres); Alternative C (202,320 acres); and Alternative D (202,325 acres). *Id.* Ch.2, Table 2-1; 2-3; 2-4; 2-6.

188. Screen 3 conducts a multiple-use conflict analysis, and land with coal development potential may be eliminated from further consideration for leasing where multiple uses conflict. Under Screen 3, the alternatives excluded the following number of acres based on multiple-use conflicts: Alternative A (193,910 acres); Alternative B (1,671,040 acres); Alternative C (1,744,240 acres); and Alternative D (1,745,040 acres). *Id.* Ch.2, Table 2-1; 2-3; 2-4; 2-6.

189. Even though BLM's multiple-use mandate requires it to balance "public lands and their resource values," BLM explained that the lands evaluated under Alternative B, C, and D were unsuitable for leasing based on "the climate change criterion for air resources," which it made progressively stricter under each alternative. *See id.* at ES-4–ES-5. BLM did not explain which "resource value," which FLPMA requires the agency to consider when evaluating multiple-use objectives, relates to greenhouse gas emissions or climate change. 43 U.S.C. §1702(c). Nor did BLM explain how it made this multiple-use assessment without considering the actual resources identified by FLPMA. 43 U.S.C. §1702(c). The agency should have relied on resources identified expressly by FLPMA itself.

190. Screen 4 requires consultation with qualified surface landowners, and land with coal development potential may be eliminated from further consideration for leasing based on qualified surface owner preference. Under Screen 4, the alternatives excluded the following number of acres based on multiple-use conflicts: Alternative A (236,630 acres); Alternative B (820 acres); Alternative C (820 acres); and Alternative D (820 acres). *Id.* Ch.2, Table 2-1; 2-3; 2-4; 2-6.

191. After applying the screens, the alternatives provided that the following number of acres were acceptable for future coal leasing and development: Alternative A (1,214,380 acres); Alternative B (69,310 acres); Alternative C (810 acres); and Alternative D (0 acres). *Id.* Ch.2, Table 2-1; 2-3; 2-4; 2-6.

192. Governor Gianforte submitted his Consistency Review of the Miles City Final SEIS and Proposed RMPA on July 16, 2024. The Governor's Consistency review was the statutorily guaranteed chance for Governor Gianforte to identify inconsistencies between the No Leasing Alternative (Alternative D) selected in the Final SEIS and Proposed RMPA and Montana's constitution, statutes, programs, and policies. *See* 43 U.S.C. §1712(c)(9).

193. In Governor Gianforte's Consistency Review (which incorporated DNRC's June 17, 2024 protest by reference), he identified the following inconsistencies:

a. The No Leasing Alternative is inconsistent with Montana's constitutional mandate to utilize state trust funds to fund schools and other public institutions;

b. The No Leasing Alternative is inconsistent with Montana's "all-of-the-above" energy strategy to provide reliable and affordable energy to communities;

c. The No Leasing Alternative is inconsistent with Montana's policy that public utility energy companies develop a plan, known as an Integrated Resource Plan (IRP), for meeting Montana's energy needs;

d. The No Leasing Alternative may be consistent with Northwestern Energy's 2023 IRP, given the impact on the Rosebud Mine, the major coal supplier to the Colstrip power plant (and BLM failed to consider the IRP in the Final SEIS);

e. The No Leasing Alternative is inconsistent with Montana's coal revenue trust fund policy;

      f.   The No Leasing Alternative is inconsistent with FLPMA;

      g.   The No Leasing Alternative is inconsistent with the Mineral Leasing Act;

      h.   The No Leasing Alternative is inconsistent with the Mining and Mineral Policy Act of 1970;

      i.   The No Leasing Alternative is inconsistent with the Fair Market Value Policy of Federal Coal Leasing of 1984;

194.    Based on these inconsistencies, Governor Gianforte recommended that BLM withdraw the Miles City Field Office Final SEIS and Proposed RMPA and work collaboratively with Montana to form alternatives that honor existing Montana plans, policies, and programs.

195.    BLM's State Director, Sonya Germann, responded to the Governor's Consistency Review on August 16, 2024. BLM addressed the three specific inconsistencies identified in the Governor's Consistency Review and concluded that no changes to the Miles City Field Office Final SEIS and Proposed RMPA were warranted. Mont. Miles City Consistency Review Response at 1 (Aug. 12, 2024). The State Director did not indicate why BLM did not accept the Governor's recommendation.

196.    The State Director's response dismissed Montana's concern that the checkerboard ownership pattern limits (and likely destroys) Montana's and private owners' ability to mine their tracts of land. The State Director said that the Final SEIS/Proposed RMPA only applies to federally administered coal in the Miles City Field Office area and does not make decisions regarding state or privately owned coal resources. *Id.* at 3. Yet the State Director said that "BLM recognizes that logical mining is most efficient when large blocks of land are available to mine continuously and restraining adjacent lands causes a setback from the property line to prevent trespass of the adjacent mineral owner." *Id.* at 4.

197.    In response to the Governor's concern that the Final SEIS/Proposed RMPA was inconsistent with Montana's constitutional mandate to utilize trust lands to fund schools and other institutions, the State Director said, "it would be speculative for BLM to include analysis of lost State

revenue in consideration of predominate federal coal estate" that historically takes more than 10 years "to lease and permit a mine expansion." *Id.* at 5. Even so, the State Director noted that the "Proposed RMPA ... acknowledge[s] the mineral ownership pattern and that nonfederal mining would likely be impacted." *Id.* But even while acknowledging that "the historical nature of large strip mines would not be feasible for non-federal mining," the State Director concluded that BLM's "decision would have no impact to the management decisions for the State trust lands and would not preclude the State's authority to manage, permit[,] and bill other uses of DNRC lands ... to meet its fiduciary responsibility." *Id.*

198.    In response to the Governor's concern that the Final SEIS/Proposed RMPA was inconsistent with Montana's "all-of-the-above" energy strategy, the State Director determined that neither the Northwestern Energy 2023 IRP nor the Montana Coal Country Coalition's Report constituted officially approved or adopted resource-related plans, so there were no inconsistencies between such plans and Alternative D. *Id.* at 6. The State Director therefore concluded that Alternative D was consistent with Montana's "all-of-the-above" energy strategy. *Id.* at 7.

199.    In response to the Governor's concern that the Final SEIS/Proposed RMPA was inconsistent with Montana's coal revenue trust fund policy, the State Director observed that "[w]hile there are state and federal policies that may encourage coal mining and facilitate the orderly development of coal resources, they do not mandate that coal mining be authorized wherever coal reserves may be present." *Id.* So the State Director concluded that "Alternative D would not change existing leases and severance taxes paid to the state." *Id.* Yet this fails to acknowledge that one reason for the reduced development of coal resources (and thus reduced tax revenues) on State-owned lands or by private owners is the checkerboard ownership pattern that inhibits the orderly development of coal resources on non-federal lands.

200.    While the consistency review was underway, the parties also engaged in protests. The protest period follows publication of the Final SEIS and Proposed RMPA in the Federal Register and allows interested parties to provide feedback on the proposed plan. Unlike the Governor's Consistency Review, the protest period is open to any entity that has an interest in or may be adversely affected by the plan. 43 C.F.R. §1610.5-2. While the scoping process purports to allow the public to provide feedback on potential issues before BLM releases the draft SEIS, the protest period is supposed to allow public feedback after the final SEIS.

201.    The following parties filed protests to the Proposed RMPA following the release of the Miles City Field Office Final SEIS and Proposed RMPA: Montana Coal Council, Landmark Resource Firm, Montana Natural Resource Coalition of Counties, Westmoreland Mining LLC, Montana DNRC, National Mining Association, Navajo Transitional Energy Company, and Senator Steve Daines.

202.    The protests mirrored many of the same concerns identified by Governor Gianforte in his consistency review.

203.    Beyond the concerns identified by the Governor, the protests by Montana Natural Resource Coalition of Counties, Montana Coal Council, and Westmoreland Mining LLC, note that Alternative D constitutes a withdrawal under FLPMA. Miles City Field Office, BLM Protest Resolution Report, at 3 (Nov. 13, 2024). And they argue that this "withdrawal" violates FLPMA because BLM failed to comply with the statutory requirements necessary to make all of the Miles City Field Office area unavailable for coal leasing. *Id.*

204.    DNRC's protest identified other key problems with the Final SEIS and Proposed RMPA. First, it failed to appropriately account for the lost royalty value to the State trust beneficiaries. DNRC Protest, at 3; Taylor Decl. ¶11. Second, it inappropriately relied on a social cost of greenhouse gases methodology (SC-GHG) to determine that future coal leasing was unsuitable in the Miles City

Field Office area. DNRC Protest, at 5. Third, it limits the future development of Rare Earth Elements associated with coal deposits on state, federal, and private mineral estate within the Miles City Field Office area. *Id.* at 5-6.

205.    Looking more closely at the lost royalty value, in fiscal year 2023, Montana's trust land generated nearly $46 million in royalties for the Montana's trust land beneficiaries from coal produced on just five tracts. Utilizing a study from the Montana Bureau of Mines and Geology (MBMG)—Report 22, entitled "Coal Resources of Montana"—DNRC calculated the amount of available and mineable coal on Montana's trust lands in the Miles City Field Office area to be 1.54 billion tons. The average coal price received over the last 12 months is $22.42/ton and Montana's trust land coal leases have a royalty rate of 12.5 percent for coal strip mines. With those inputs, the total royalty value lost to the trust land beneficiaries due to sterilized coal within the Miles City Field Office area due to the selection of Alternative D is approximately $4.32 billion. Taylor Decl. ¶11.

206.    In September 2024, Governor Gianforte appealed the Montana/Dakota State Director's response to his Consistency Review. Appeal of BLM Response to Governor's Consistency Review of Miles City Final SEIS and Proposed RMPA (Sept. 18, 2024). In his appeal, Governor Gianforte claimed that the State Director's response was deficient because it failed to adequately respond to his arguments that Alternative D was inconsistent with Montana's: (1) constitutional mandate to utilize state trust lands to fund schools and other public institutions; (2) "all-of-the-above" energy strategy; and (3) coal revenue trust fund policy. *Id.* at 2-3. He also argued that "BLM's analysis reflect[ed] a pre-decisional bias against future coal development in that all of the Alternatives preclude mining of state and private coal interests in economical and logical mining units. *Id.* at 3-4. And by placing a moratorium on federal coal leasing in the Miles City Field Office area, BLM effectively "sterilizes 100 percent (all 1.54 billion tons) of the state coal reserves, which will amount to a loss of a $4.32 billion asset to the Montana School Trust beneficiaries." *Id.* at 4.

207.    In early November 2024, Director Tracy Stone-Manning responded to the Governor's appeal in 2-page form letter. BLM Response to Governor's Appeal of State Directors Response to Consistency Review (Nov. 6, 2024). The Director's response did not appear to engage in meaningful analysis of the arguments raised in the Governor's appeal, as her responses simply parroted the State Director's responses in the response to the Governor's original consistency review.

208.    On November 13, 2024, BLM published the Director's Protest Resolution Report for the Miles City Field Office Final SEIS and Proposed RMPA. *See* Miles City Protest Resolution Report (Nov. 13, 2024), *available at* https://perma.cc/T8WJ-HDQG.

209.    In this report, BLM rejected all the arguments in the protests and stated that "no changes to the Miles City FSEIS/PRMPA were necessary." *Id.* at 1.

210.    On November 27, 2024, BLM issued the Miles City ARMPA. *See* 89 Fed. Reg. 93650 (Nov. 27, 2024); *see also* https://perma.cc/J2JE-KGJ2. The Miles City ARPMA adopted Alternative D (the No Leasing Alternative) without any change from the Final SEIS/Proposed RMPA. *See* Miles City AMPRA, at 1-4. This will effectively cause new coal leasing—even of maintenance areas—to cease immediately.

211.    BLM's rationale for the decision is that making 1.745 million acres unavailable was that it was necessary to "reduce greenhouse gas (GHG) emissions as a proxy for climate change." *Id.* It further argued that its decision was necessary to comply with various executive orders about climate change, that the U.S. energy markets are moving away from coal, and to reduce long-term risks to public health or safety from GHG emissions. *See id.* at 1-5. But none of these justifications justify BLM's decision to end new coal leasing altogether.

212.    The Miles City ARMPA repeats the same error from the Final SEIS and Proposed RMPA, and it ignores the inconsistencies identified during the Governor's consistency review process.

213.    This decision is inconsistent with the MLA, FLPMA, NEPA, and federal regulations governing the resource management plan process.

214.    This decision is inconsistent with Montana state law.

215.    The Miles City ARMPA acknowledges that the Miles City Field Office area contains 1,745,040 acres of BLM administered land in the decision area with coal development potential. Miles ARMPA, at 1-4.

216.    Under Screen 3, the multiple-use screen, BLM excluded between 1,661,530 acres (95.2%) and 1,745,040 acres (100%) from consideration for future coal leasing under Alternatives B, C, and D. Miles City Final SEIS and Proposed RMPA, at A-6. While these exclusions were made based on air resource values, *see id.*, BLM failed to explain how it made a resource assessment concluding that *no* federal coal is suitable for leasing. Rather, it simply says that excluding all "1,745,040 acres of BLM administered coal from further consideration" was necessary "to reduce greenhouse gas (GHG) emissions as a proxy for climate change." Miles City ARMPA, at 1-4.

217.    The Miles City ARMPA sterilizes 100 percent of Montana trust land coal tracts within the Miles City Field Office area because of the checkerboard ownership pattern of federal and state-owned tracts of land (and the need for larger, contiguous ownership areas in order to mine). *See* DNRC Protest, at 2. Even before the Miles City ARMPA, the checkerboard ownership pattern had already sterilized all but 275,000 acres of the 1.54 million acres Montana owns in the Miles City Field Office area. *See id.*

218.    By making the entire area unavailable for future leasing, the Miles City ARMPA will eliminate all future interest in exploring or developing coal within the Miles City Field Office area given the vast federal estate surrounding nearly all Montana-owned and privately owned coal tracts in the area. *Id.* at 3.

219.    Montana has a direct financial stake in federal coal leasing on land within the State of Montana.

220.    The Miles City ARMPA will also cause a substantial loss of revenue.

## CLAIMS FOR RELIEF

### Count I
### The Records of Decision and Approved Resource Management Plan Amendments for the Buffalo Field Office and Miles City Field Office constitute a de facto withdrawal in violation of FLPMA
### (5 U.S.C. §706)

221.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

222.    The challenged ARMPAs are final agency actions under the APA. 5 U.S.C. §704.

223.    The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* §706(2).

224.    A withdrawal or suspension of mineral leasing falls within FLPMA's definition of a "withdrawal." *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987). The No Leasing Alternative constitutes a withdrawal because it removes the Powder River Basin from the operation of laws that otherwise authorize coal leasing.

225.    Congress set forth the procedures for making withdrawals in 43 U.S.C. §1714.

226.    The Secretary alone is authorized to make withdrawals, or the Secretary may delegate withdrawal authority to individuals in the Office of the Secretary who have been appointed by the President, by and with the advice and consent of the Senate. 43 U.S.C. §1714(a). Here, the withdrawals were made by the State Directors of Wyoming and Montana-Dakotas, who are not nominated by the President.

227.    The Secretary must publish a notice in the Federal Register that a proposal has been made to withdraw lands. 43 U.S.C. §1714(b). Here, the withdrawals were incorporated into the Buffalo and Miles City ARMPAs, and the Secretary never published a notice of withdrawal.

228.    The Secretary must hold a public hearing before promulgating a withdrawal. 43 U.S.C. §1714(h). The Secretary did not hold a hearing on the withdrawal of these lands.

229.    Any withdrawal over 5,000 acres can only be withdrawn for a "period of not more than twenty years." 43 U.S.C. §1714(c)(1). Since no new coal lease applications would be accepted, coal production in the Powder River Basin would end in 2041. The withdrawal of this land would therefore extend more than twenty years.

230.    The Secretary must notify both Houses of Congress of a withdrawal of over 5,000 acres. 43 U.S.C. §1714(c). The Secretary failed to notify either the House or the Senate.

231.    Because BLM failed to comply with the requirements of 43 U.S.C. §1714, both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with law. 5 U.S.C. §706(2).

### Count II
### The Records of Decision and Approved Resource Management Plan Amendments for the Buffalo Field Office and Miles City Field Office violate FLPMA's multiple use mandate (5 U.S.C. §706)

232.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

233.    FLPMA mandates that land use plans observe the "principle[] of multiple use." 43 U.S.C. §1712(c)(1).

234.    Removing the areas from federal coal leasing does not satisfy FLPMA's multiple use mandate, and it ignores FLPMA's order to take consider account "renewable and nonrenewable resources, including … minerals." 43 U.S.C. §1712(c).

235.    FLPMA does not identify climate change or greenhouse gas emissions as resources that need to be balanced under FLPMA's multiple use mandate. Yet BLM elevated these considerations above resource values expressly identified in FLPMA.

236.    Because BLM failed to comply with FLPMA's multiple use mandate, both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with the law. 5 U.S.C. §706(2).

**Count III**
**The Records of Decision and Approved Resource Management Plan Amendments for the Buffalo Field Office and Miles City Field Office failed to comply with coordination requirements in violation of FLPMA**
**(5 U.S.C. §706)**

237.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

238.    FLPMA directs the Secretary to coordinate land management with State and local governments to the extent such coordination is consistent with the laws governing the administration of the public lands. 43 U.S.C. §1712(c)(9). The coordination with State and local governments must be meaningful. *Id.*

239.    BLM has separately issued regulations to facilitate coordination with state governments for resource management planning under FLPMA. *See, e.g.*, 43 C.F.R. §§1601.0-2, 1610.4.3-2.

240.    BLM's regulations require that "the State Director shall submit to the Governor of the State(s) involved, the proposed plan or amendment and shall identify any known inconsistencies with State or local plans, policies, or programs." 43 C.F.R. § 1610.3-2.

241.    BLM's regulations mandate that BLM provide a "draft plan … for comment to the Governor of the State involved." 43 C.F.R. §1610.4-7; *see also* BLM Land Use Planning Handbook H-1601-1, Appendix E; *id.* at III.A.10.

242. Coordination and consistency are separate requirements. *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 876-77 (9th Cir. 2017) (analyzing the consistency and coordination requirement separately). BLM has failed to satisfy either requirement.

243. As explained above, BLM failed to provide draft or proposed language of the proposed Buffalo RMPA.

244. BLM also failed to contact the Office of the Wyoming Governor after publishing the Buffalo FSEIS.

245. BLM's first official correspondence came only after the Wyoming Governor submitted his consistency review.

246. Likewise, BLM's first official correspondence with Montana came only after the Montana Governor submitted his consistency review.

247. BLM did not acknowledge or explain why BLM did not accept the recommendations made by the Governor of Wyoming or the Governor of Montana.

248. Because BLM failed to comply with FLPMA's or coordination requirement, both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with the law. 5 U.S.C. §706(2).

**Count IV**
**The Records of Decision and Approved Resource Management Plan Amendments for the Buffalo Field Office and Miles City Field Office failed to comply with consistency requirements in violation of FLPMA**
**(5 U.S.C. §706)**

249. Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

250. BLM's regulations require that "the State Director shall submit to the Governor of the State(s) involved, the proposed plan or amendment and shall identify any known inconsistencies with State or local plans, policies, or programs." 43 C.F.R. § 1610.3-2.

251.    BLM's guidance further instructs the agency to "submit the proposed plan, revision, or amendment to the Governor(s) of the state(s) involved" for the Governor's consistency review. BLM Land Use Planning Handbook H-1601-1, Appendix E.

252.    BLM must also notify state governments of inconsistencies and make the "resource management plans …consistent with officially approved or adopted resource related plans." 43 C.F.R. §1610.3-2.

253.    As explained above, BLM did not address the inconsistencies between the FSEIS and federal law, regulation, and policy.

254.    BLM did not address the inconsistencies between the Buffalo FSEIS and Wyoming laws, regulations, or policies. In fact, in the response to the Wyoming Governor's consistency review signed by Director Archuleta on August 16, 2024, BLM agrees that the Buffalo RMPA is inconsistent with the laws, policies, programs, and plans of the State of Wyoming.

255.    BLM did not attempt to make the Buffalo RMPA consistent with Wyoming State law, Wyoming State and County policy, or local land use plans. Nor did BLM attempt to make the Miles City RMPA consistent with Montana law, programs, or policies.

256.    Because BLM failed to comply with FLPMA's consistency requirement, both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with the law. 5 U.S.C. §706(2).

**Count V**
**The Records of Decision and Approved Resource Management Plan Amendments for the Buffalo Field Office and Miles City Field Office failed to comply with NEPA**
**(5 U.S.C. §706)**

257.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

258.    NEPA has its own coordination requirements. It requires every agency "to coordinate and consult with any other Federal or State agency, or [] to act, or refrain from acting contingent upon the recommendation or certification of any other Federal or State agency." 42 U.S.C. §4334.

259.    For the same reasons BLM failed to comply with FLPMA in coordinating with the State of Wyoming and the State of Montana, BLM failed to comply with NEPA.

260.    BLM also failed to consider an adequate range of alternatives. *Muckleshoot Indian Tribe*, 177 F.3d at 813. Although the No Action Alternative in the Buffalo ARMPA would make 48.01 billion short tons of coal available for leasing, the Limited Leasing Alternative only makes 1.24 billion short tons of coal available—only slightly more than the No Leasing Alternative makes available. Likewise, in the Miles City ARMPA, the No Action Alternative would leave 1,214,380 acres available for future coal leasing, while the Limited Leasing Alternatives—Alternatives B and C—would only make available 69,310 acres and 810 acres, respectively. Both alternatives would only make slightly more acreage available for federal coal leasing than the No Leasing Alternative. Miles City Final SEIS and Proposed RMPA, at ES-4.

261.    Both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with the law. 5 U.S.C. §706(2).

## Count VI
### The Records of Decision and Approved Resource Management Plan Amendments for the Buffalo Field Office and Miles City Field Office are arbitrary and capricious (5 U.S.C. §706)

262.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

263.    The "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

264.    An agency action is arbitrary and capricious if it fails to take into account important aspects of the problem. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State* Farm, 463 U.S. 29, 43 (1983).

265.    An agency action is arbitrary and capricious if it departs from prior policy without sufficient justification. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

266.    BLM's RMPA is arbitrary and capricious because it is unreasonable, fails to take into account important aspects of the problem, and departs from its prior policy without sufficient justification.

267.    *First*, the agency's decision not to enter into leasing agreements in the Powder River Basin is unreasonable given that the Powder River Basin accounts for 85% of federal coal production.

268.    BLM failed to provide sufficient justifications for ending leasing in an area that is critical to the State of Wyoming, the State of Montana, and the United States as a whole.

269.    The agency's decision in the Powder River Basin is unreasonable because the agency recently signaled that it plans to allow North Dakota to continue leasing coal on federal land. 89 Fed. Reg. 65391, 65392 (Aug. 9, 2024).

270.    BLM justified its decision in the Powder River Basin by saying that the No Leasing Alternative would "reduce greenhouse gas emissions." Buffalo 2024 ARMPA at 1-1; Miles City ARMPA at 1-4. But it does not address greenhouse gas emissions as one of the justifications for permitting North Dakota to continue its limited leasing. *See* North Dakota Proposed Resource Management Plan and Final Environmental Impact Statement, BLM, Vol. 1 (July 2024), https://perma.cc/MRQ4-URSF; see also 89 Fed. Reg. 65391, 65392 (Aug. 9, 2024).

271.    *Second*, BLM failed to consider the devastating impact this will have on the State of Wyoming and the State of Montana, including—but not limited to—the effects that this withdrawal will have on funding within the State.

272.    BLM also failed to consider the impact this will have on the United States, which will increase the nation's dependence on high-sulfur coal within the United States as well as foreign sources of minerals.

273.     *Third*, BLM's RMPA is inconsistent with its position in 2015, when it determined that mineral leasing in the Powder River Basin "best achieves the mix of multiple use." Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region, Dep't of Interior, at 3-15 (Sept. 2015), https://perma.cc/9S8K-3E55. BLM fails to explain its departure from prior policy.

274.     BLM's RMPA is also inconsistent with its 2019 RMPA, which concluded that no inconsistencies existed between Campbell County's Land Use Plan and federal law. 2019 Buffalo ARMPA at 1-11. Although Campbell County's Land Use Plan contains the same language as it did in 2019, BLM now concluded that the County's Land Use Plan is inconsistent with federal law. BLM fails to explain this departure from prior policy and practice.

275.     *Fourth*, BLM's RMPA failed to consider the non-thermal uses of coal, including the production of Rare Earth Elements and other critical minerals.

276.     *Fifth*, BLM determined that its decision will not have an impact on the management decision for Wyoming trust lands, even though the evidence before the agency showed that all non-federal mining, including on State trust lands in the potential coal development area, would likely stop. Likewise, BLM determined that its decision will not have an impact on the management decision for Montana trust lands, even though the evidence before the agency showed that all nonfederal mining, including on State trust lands, would likely stop.

277.     *Sixth*, BLM ignored input from State and local leaders in Wyoming and Montana about how its decision departs from Wyoming's and Montana's existing laws, plans, policies, and programs.

278.     Both the Buffalo and the Miles City ARMPAs are unlawful because they are arbitrary and capricious, unreasonable, and fail to consider important aspects of the problem. 5 U.S.C. §706(2).

**Count VI**
**The Records of Decision and Approved Resource Management Plan Amendments for the**
**Buffalo Field Office and Miles City Field Office violate the Mineral Leasing Act**
**(5 U.S.C. §706)**

279.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

280.    One of the core purposes of the MLA is to promote coal mining. Act of Feb. 25, 1920, ch. 85, §32, 41 Stat. 437.

281.    While the Secretary has some discretion under the MLA, the Secretary does not have the discretion to take action that violates the core purpose of the MLA.

282.    In response to the Governor's consistency review, BLM has not identified any legal authority that says the Secretary's authority includes the power to stop leasing altogether in an area rich with mineral resources.

283.    Both the Buffalo and the Miles City ARMPAs are unlawful because they abuse the Secretary's discretion and exceed the Secretary's authority. 5 U.S.C. §706(2).

**PRAYER FOR RELIEF**

284.    Petitioners, the State of Wyoming and the State of Montana, respectfully request that the Court enter judgment for Petitioners and against Defendants and provide the following relief.

    a.    a declaration that the Buffalo Field Office ARMPA is arbitrary and capricious within the meaning of 5 U.S.C. §706;

    b.    a declaration that the Miles City Field Office ARMPA is arbitrary and capricious within the meaning of 5 U.S.C. §706;

    c.    a declaration that the Buffalo Field Office ARMPA is an abuse of discretion within the meaning of 5 U.S.C. §706;

    d.    a declaration that the Miles City Field Office ARMPA is an abuse of discretion within the meaning of 5 U.S.C. §706;

e.  a declaration that the Buffalo Field Office ARMPA is not in accordance with law within the meaning of 5 U.S.C. §706;

f.  a declaration that the Miles City Field Office ARMPA is not in accordance with law within the meaning of 5 U.S.C. §706;

g.  vacatur of the Buffalo and Miles City ARMPAs;

h.  a permanent injunction barring enforcement of the Buffalo and Miles City ARMPAs; and

i.  any other relief that the Court deems just and proper.

Dated: December 11, 2024

Respectfully submitted,

/s/ David Dewald

KATHLEEN S. LANE*
Special Assistant Attorney General
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
katie@consovoymccarthy.com
*Attorney for Plaintiff State of Wyoming*

TYLER R. GREEN
Special Assistant Attorney General
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Attorney for Plaintiff State of Wyoming*

*\*Application for admission pro hac vice forthcoming*

BRIDGET HILL
Wyoming Attorney General
D. DAVID DEWALD
Deputy Attorney General
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov
*Attorney for Plaintiff State of Wyoming*

AUSTIN KNUDSEN
Attorney General of Montana
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.*
Deputy Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov
*Attorneys for Plaintiff State of Montana*